UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL A. ROGERS,

       Plaintiff,

v.

THE SALVATION ARMY,

       Defendant.

_____/

Case No. 14-12656

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

This employment discrimination and harassment dispute comes before the Court on Defendant The Salvation Army's ("TSA") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff's four-count complaint alleges that TSA discriminated against her on the basis of race and age in violation of Title VII, the Age Discrimination in Employment Act ("ADEA"), and Michigan's Elliot Larsen Civil Rights Act ("ECLRA").[1] Plaintiff also raises a claim for sexual harassment based on her belief that she was subjected to a hostile work environment. TSA argues that Plaintiff is a disgruntled former employee who was demoted and ultimately terminated for failing to live up to the organization's standards. As such, TSA maintains that Plaintiff's complaint should be dismissed.

For the reasons set forth below, the Court grants TSA's motion for summary judgment and dismisses Plaintiff's claims with prejudice.

_____

[1] 42 U.S.C § 2000e, *et seq.*, 29 U.S.C. § 621, *et seq.*, and Mich. Comp. Laws. § 37.2101, *et seq.*, respectively.

## I.    Facts

The Salvation Army ("TSA") is "an evangelical part of the universal Christian Church. Its message is based on the Bible. Its ministry is motivated by the love of God." (Def.'s Mot. Ex. DD, TSA Handbook). TSA's "mission is to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination." (*Id.)* With respect to its hiring policies, TSA is clear in its handbook that "[i]t is expected that all employees . . . will endeavor to relate to those whom the [TSA] serves in the spirit of Christian love, consistent with our Mission Statement." (*Id.*)

Plaintiff Carol Rogers is a 67 year-old white female who was first employed by TSA in January of 1999 as a part-time finance clerk in the addiction recovery center ("ARC"). (Def.'s Mot. Ex. A, Rogers Dep. 51). After a little over two-years in this position, Plaintiff opted to part ways with TSA to pursue a career in the mortgage services industry. (*Id.* at 63). By all accounts, Plaintiff left TSA on good terms with her then supervisor, Merle Miller ("Mr. Miller").

In April 2005, Mr. Miller re-hired Plaintiff as an addictions counselor at the ARC. (*Id.*). At the time, Plaintiff was not certified with the State of Michigan to work with addicts, but it was understood that she would pursue the required training before commencing her new role. Plaintiff was given a job description outlining her responsibilities, which included, among other things, "4. Monitor[ing] beneficiaries to evaluate effectiveness of rehabilitation program and adapt treatment plan as needed. 6. Prepar[ing] formal work therapy evaluations and work adjustment reports . . . . 10. Provide statistical information to the personnel responsible for the preparation of the monthly reports." (Def.'s Mot. Ex. B, Counselor I- Duties/Responsibilities). As the description provided by TSA suggests,

2

Plaintiff's position had administrative and counseling components, both of which were integral to the ARC's functionality.

As far as the Court can tell, Plaintiff's first four years with TSA were relatively uneventful. During that time, Plaintiff reported to Dr. Billy Taylor, director of ARC's program services. (Rogers Dep. 80-84). In 2009, Dr. Taylor left ARC--seemingly on good terms--and was replaced by the former assistant director, Dr. Harrison Igwe, a Nigerian male. (*Id.*). Dr. Igwe reported to Mr. Miller and Cheryl Miller ("Mrs. Miller"), the administrator of family ministries. At some point after Dr. Igwe accepted his new position, Brenda Thompson, an African American woman, was hired to assume the role of assistant director. (Def.'s Mot. Ex. C, Igwe Dep. 26). While Thompson was Plaintiff's direct supervisor, Dr. Igwe frequently interacted with Plaintiff and closely monitored her job performance.

The 2009 leadership transition signaled a turn in the tide with respect to Plaintiff's job satisfaction and overall working relationship with her superiors. In or around May of 2010, for example, Thompson conducted an individual evaluation of each of the addiction counselors. (Def.'s Mot. Ex. D, Thompson Dep. 15). With respect to Plaintiff, Thompson noted that while she was "very good at praying with [her clients and], telling them what scriptures to read . . . ." she consistently struggled to fulfil the administrative aspects of the job, explaining that: "I would go to her and say, Carol, you need to catch up your dates; Carol, you need to catch up your paperwork. I would personally talk to her [even] when I had the right to write [her] up . . . . I would let her know verbally that she needed to do some work on her jobs." (Thompson Dep. 24-25). Thompson testified that she spoke with Plaintiff on more than one occasion "about her failure to maintain charts or records." (*Id.* at 33).

3

Dr. Igwe likewise provided verbal warnings to Plaintiff regarding her failure to adequately maintain client records. (Igwe Dep. 68-69). In July of 2012, this issue officially came to a head after Plaintiff was issued a "written warning notice." (Def.'s Mot. Ex. II). The seriousness of the notice becomes clear in the introductory narrative on the form: "This warning is being given to you because certain kinds of actions . . . cannot be permitted on the job. [T]his warning may also be issued in conjunction with a Notice of Suspension or Termination." (*Id.*) The infraction giving rise to the warning was described as "incorrect dates  . . . [and] allowing too much time between counseling sessions . . . ." (*Id.*). In other words, the notice was yet another reprimand concerning Plaintiff's record-keeping practices. Plaintiff, for her part, acknowledged receiving the warning notice--and the importance of maintaining accurate reports--but steadfastly denied any suggestion that she failed to meet with her clients on a regular basis. (Rogers Dep. 105-07).

Approximately one year later, Mrs. Miller--the head of Plaintiff's department--instructed Dr. Igwe to perform an independent performance evaluation of all addiction counselors. (Igwe Dep. 41). According to the report authored by Dr. Igwe, Plaintiff's job performance was the second lowest in her department. (Def.'s Mot. Ex. Y, Counselors Performance Evaluation). Dr. Igwe further noted that he "discussed [the] evaluation report with Carol Rogers. Needs to quickly improve on her knowledge and mastery. Further discussed her lack of capacity  to assist a [client] with his related problems." (*Id.*). Around the same time as Dr. Igwe's evaluation, TSA, in response to the needs of its clients, was in the process of expanding its "spiritual development department." Recognizing that Plaintiff consistently struggled in the ARC--and was particularly proficient in spirituality counseling--TSA offered to transfer Plaintiff to the new department in lieu of termination. *See* (Def.'s Mot. Ex. H,

4

Cheryl Miller Dep. 65) (we "thought that Carol would be more effective in the spiritual development department because that's where her heart was."). Dr. Igwe recommended the transfer and it was approved by Mr. and Mrs. Miller.

In or around July 2013, Plaintiff's job title was officially changed to Spiritual Counselor. According to a memo written to Plaintiff on July 10, 2013, her new duties included "help[ing] Employees, and Beneficiaries to develop a relationship with God, through Jesus Christ, and then grow in that personal relationship." (Def.'s Mot. Ex. W, Rogers Job Description). As correspondence between Plaintiff, Mr. Miller, and Connie Elliot (director of TSA's human resources) makes clear, however, the reassignment was doomed from the very beginning. First, Plaintiff expressed  a number of concerns about the reduction in pay associated with the new position. *See* (Def.'s Mot. Ex. M, Rogers Memo); (Plaintiff notes that "because of the very drastic pay cut, I cannot agree to be slashed in such a way."). While the record is hazy with respect to whether Plaintiff's concerns were ever formally addressed, it is undisputed that the transfer resulted in a pay cut of $4.56 per hour. (Def.'s Mot. 6). Plaintiff also began questioning the propriety of the process leading up to her transfer, noting in an email to Mr. Miller that "I also was told that I am not qualified to be an addictions counselor, [i]s this discrimination?" (Def.'s Mot. Ex. I, Rogers Email). Plaintiff's email to Mr. Miller was later forwarded to TSA's human resources supervisor, Natalie Hunt, who testified that she did not consider the message to be a complaint for discrimination because "[t]here are no facts. There is no information. It's just an open-ended question. It's just a word on a piece of paper." (Def.'s Mot. Ex. N, Hunt Dep. 25). Hunt further testified that Plaintiff never complained to her about any discrimination or harassment in the workplace. (*Id.* at 66).

5

Perhaps not surprisingly, Plaintiff's tenure in the spiritual development department was short-lived. In fact, the director of the department, James McSpadden, recommended terminating Plaintiff within her first month on the job. (Def.'s Mot. Ex. F, McSpadden Dep. 13-14). According to McSpadden, Plaintiff was missing reports for over half of the clients she was scheduled to see, and another 7 had not been updated in nearly a month. (Def.'s Mot. Ex. J, Rogers Caseload Spreadsheet). Plaintiff admitted that the reports were not in her file at the time of McSpadden's review, but maintained that they "were clipped together on [her] desk, being updated." (Rogers Dep. 139)*;* (Def.'s Mot. Ex. Q, Rogers Letter). When asked why he opted to recommend immediate termination, McSpadden reasoned that:

> The caseload that [Plaintiff] had in addictions counseling, . . . became her spiritual counseling [clients]. So naturally when I went through the files I had to see the charting from her addiction counseling before it was stopped, and there was a lot of missed entries. I didn't want [that] in my department. She carried her lack of charting from addiction counseling to spiritual counseling.

(McSpadden Dep. 94). In addition, McSpadden noted that Plaintiff "would be sitting in her office talking on the telephone with the door shut or on the computer and this would be two or three hours I would walk past, she would still be doing the same thing." (*Id.* at 76). On August 23, 2013, Plaintiff was terminated.

Two days after Plaintiff's termination, she sent a letter to Major Graham Allan, territorial commander for the ARC, alleging that she had been "the victim of repeated offensive sexual remarks, and physical touch." (Def.'s Mot. Ex. O, Rogers Letter). Plaintiff went on to describe a series of isolated incidents involving Mr. Miller and Dr. Igwe. With respect to Mr. Miller, Plaintiff focused on a meeting in 2009 when he allegedly jerked her head and slapped her in front of the "whole counseling dep[artment] staff, and Cheryl Miller." (*Id.*). Plaintiff further remarked that Mr. Miller (1) placed his hand on her neck, (2)

6

"always had a degrading remark to me whenever I was in his presence" and, (3) in the summer of 2013, put his hand "around my waist . . . with remarks, you are one good looking woman." (*Id*). As for Dr. Igwe, Plaintiff maintained that he often made lewd comments such as "touchdown", and would open her office and blow her kisses. (*Id.*). According to Plaintiff, she "reported these incidences [sic] on numerous occasions to counseling dept. staff co-workers." (*Id.*).

In the months following Plaintiff's termination, she exchanged a number of emails with Connie Elliott from TSA's human resources department. (Def.'s Mot. Ex. V, Rogers/Elliott Emails). The focus of Plaintiff's correspondence with Elliott was not her allegations of discrimination and harassment--which, incidentally, never came up--but rather a request to have her termination date extended for purposes of collecting a pension. TSA ultimately granted Plaintiff's request, extending her time in service well beyond the date she was formally discharged. (*Id.*).

On September 3, 2013, Plaintiff filed a charge of discrimination with the EEOC alleging sex and age discrimination. (Def.'s Mot. Ex. T, EEOC Charge). Plaintiff later amended her charge to include a claim for reverse race discrimination. (Def.'s Mot. Ex. U, Amend EEOC Charge). On July 7, 2014, Plaintiff filed the instant suit, alleging race and gender discrimination and sexual harassment under Title VII and ECLRA.

## II.  Summary Judgment Standard

The Sixth Circuit employs the familiar standard for summary judgment, namely, that summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*,  477 U.S. at 252.

Moreover, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

## III.   Analysis

As a preliminary matter, the Court first addresses TSA's argument that Plaintiff's claims are barred by the ministerial exception.

### A.  Plaintiff's Discrimination Claims are Barred by the Ministerial Exception

The so-called "ministerial exception" has been the subject of very recent Supreme Court and Sixth Circuit precedent. In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 132 S.Ct. 694 (2012), the Supreme Court considered, for the first time, whether the "freedom of a religious organization to select its ministers is implicated by a

8

suit alleging discrimination in employment." *Id.* at 705. After concluding that there is a ministerial exception grounded in the Religion Clauses of the First Amendment, the Court agreed that it should not be limited to "the head of a religious congregation." *Id.* at 707. While declining to "adopt a rigid formula for deciding when an employee qualifies as a minister", *id*, the Court identified four factors that led to its conclusion that Perich--a teacher and "commissioned minister"--was covered by the exception: "[1] the formal title given to Perich by the Church, [2] the substance reflected in that title, [3] her own use of that title, and [4] the important religious functions she performed at the Church." *Id.* at 708.

The Sixth Circuit, in *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015), recently applied the *Hosanna-Tabor* decision in the context of an employment discrimination suit not unlike the one currently before this Court. There, the question was whether the plaintiff--a former spiritual director at an evangelical organization--was barred by the ministerial exception from bringing claims for discrimination under Title VII and ELCRA. According to the court, the first issue was whether the plaintiff's employer was a "religious group." Concluding that it was, the court reasoned that "InterVarsity *Christian Fellowship* is a Christian organization, whose purpose is to advance the understanding and practice of Christianity in colleges and universities. It is therefore a 'religious group' under *Hosanna-Tabor*." *Id.* at 834 (emphasis in original). Indeed, the Sixth Circuit has previously held that an "employer need not be a traditional religious organizations such as a church . . . or an entity operated by a traditional religious organization" to assert the ministerial exception. *Holllins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007) (abrogated on other grounds).

Moving to the second layer of the ministerial exception analysis, the court proceeded to apply the four factors identified in *Hosanna-Tabor* to Conlon's position at InterVarsity Christian Fellowship. First, with respect to formal title, Conlon did not have the title of "minister" but rather was described as a "spiritual director." *Conlon,* 777 F.3d at 834-35. No matter, "courts need only determine whether the wording of the title conveys a religious- -as opposed to secular--meaning. The word 'spiritual' is such an identifying term." *Id.* Moreover, the religious functions performed by Conlon--the fourth *Hosanna-Tabor* factor-- included "leading others toward Christian maturity" and "teaching faithfully the Word of God . . . ." *Id.* at 835. According to the court, the mere presence of these two factors was dispositive of the issue: "[w]e need not decide in this case whether either of those factors alone suffices to invoke the ministerial exception, but we do hold that where both factors- formal title and religious function--are present, the ministerial exception clearly applies." *Id.* at 835.

Here, both layers of the *Hosanna-Tabor* analysis weigh in favor of applying the ministerial exception to Plaintiff's claims for discrimination.[2] First, the Court need not look beyond TSA's mission statement to conclude that it is a "religiously affiliated entity" whose "mission is marked by clear or obvious religious characteristics." *Conlon*, 777 F.3d at 834 (citations and quotations omitted). Indeed, TSA is "an evangelical part of the universal Christian Church. Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach the gospel of Jesus Christ and to meet human needs in His

---

[2] As far as the Court can reasonably tell, this is the first post-*Conlon* case in this Circuit to apply the ministerial exception.

name without discrimination." (Def.'s Mot. Ex. DD, TSA Handbook). As such, there is little doubt that TSA is a religious institution for purposes of the ministerial exception.

Nor is there any question that the critical factors identified in *Conlon*--formal title and religious function--militate in favor of applying the ministerial exception to Plaintiff specifically.   At the time of Plaintiff's termination, she was employed as a "spiritual counselor" in the spiritual development department. According to *Conlon*, where, as here, the word "spiritual" is part of an employee's job title, a religious meaning is sufficiently conveyed. *Id.* at 835. Moreover, Plaintiff's job description further confirms that her "prime responsibility [was] to help [clients] . . . to develop a relationship with God, through Jesus Christ, and then grow in that personal relationship."  (Def.'s Mot. Ex. W,  Job Description). Plaintiff was expected to fulfill this religious mandate through "Monday [n]ight's Christian [l]iving class"; "[m]aintaining an in-house case load . . . for spiritual direction"; and "[facilitating] . . . Wednesday night chapel service . . . [and] bible study." (*Id.*). Indeed, as Plaintiff responded when asked to describe a "day in the life" of a spiritual counselor, she boiled it down to "prayer, short Bible study. Prayer, short Bible study." (Rogers Dep. 134-35).

Additionally, while *Conlon* held that "where both factors . . . are present, the ministerial exception clearly applies", *Conlon*, 777 F.3d at 835, TSA's argument is further bolstered by the other two factors identified in *Hosanna-Tabor*. First, with respect to "the substance reflected in [Plaintiff's] title", the record reflects that Plaintiff was an ordained pastor for over ten years prior to becoming a spiritual counselor. (Def.'s Ex. G, Rogers Letter). Further, similar to *Hosanna-Tabor,* Plaintiff's "use of the title" reflected her role in conveying TSA's religious message through leading chapel service and praying with her clients on a daily

11

basis. *See Hosanna-Tabor*, 132 S.Ct. at 708 ("[a]s a source of religious instruction, Perich performed an important role in transmitting the Lutheran faith . . . ."). In short, because Plaintiff "was a minister within the meaning of the exception, the First Amendment requires dismissal of [her] employment discrimination [claims] against her religious employer." *Id.* at 709.[3]

Finally, the Court notes that this conclusion likewise applies to Plaintiff's previous role as an addictions counselor. Indeed, as her job description made clear, she was required to*, inter alia*, "[a]ssess [the] spiritual needs of [clients and] make referrals to Chaplain as needed." (Def.'s Ex. B, Counselor Job Description). In fact, according to Thompson, Plaintiff was particularly good at "praying with [her clients and], telling them what scriptures to read . . . ." (Thompson Dep. 24-25). Plaintiff's proficiency in spiritual counseling was precisely why TSA opted to give her an opportunity in the spiritual development department. *See* (Def.'s Mot. Ex. H, Cheryl Miller Dep. 65) (we "thought that Carol would be more effective in the spiritual development department because that's where her heart was."). In other words, Plaintiff was fulfilling "important religious functions" at TSA throughout the duration of her career. *See Conlon,* 777 F. 3d at 835 ("part of Conlon's duties was to assist others to cultivate 'intimacy with God and growth in Christ . . . . That is a ministerial function, and so we hold the fourth factor is satisfied.).

## B.  Plaintiff's Claims are Substantively Devoid of Merit

---

[3] The Sixth Circuit has been clear that this reasoning applies with equal force to Plaintiff's discrimination claims under ECLRA. *See Conlon,* 777 F.3d at 836 ("the ministerial exception exists in Michigan. But even if it [did] not, because the Establishment and Free Exercise Clauses apply to the States . . . the federal right would defeat any Michigan statute that, as applied, violates the First Amendment.")

### 1. Reverse Race Discrimination

Even assuming, *arguendo*, that Plaintiff's claim for reverse race discrimination was not barred by the ministerial exception, it fails on the merits.   Plaintiff's race-based discrimination claims are brought under both Title VII and Michigan's ELCRA.[4]   Race discrimination claims can be established by either direct or circumstantial evidence. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Plaintiff does not present any direct evidence of discrimination, and thus the familiar *McDonnell Douglas* burden-shifting framework applies. 411 U.S. 792, 802 (1973)).   Under this framework, the burden of production shifts, but Plaintiff "continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

To establish a prima facie case of employment discrimination under Title VII using circumstantial evidence, the plaintiff must show that (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position at issue, and (4) she was treated differently than similarly situated employees outside her protected class. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004). "In adapting the test to cases of reverse discrimination, the Sixth Circuit has held that, under the first prong, plaintiff must demonstrate 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates

---

[4] "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases."  *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

against the majority.'" *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (citations omitted).

If a prima facie case is established, the defendant can rebut the presumption of unlawful discrimination by setting forth a legitimate, non-discriminatory business reason for the challenged employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). Once this is done, the burden shifts back to the plaintiff to show that the articulated reason was a mere pretext for intentional race discrimination. *McDonnell Douglas*, 411 U.S. at 804.

Here, the Court need not look beyond the first element of the *McDonnell Douglas* framework to conclude that Plaintiff has failed to establish a prima facie case of reverse race discrimination. Indeed, as discussed, where, as here, a majority plaintiff is involved, there must be "evidence of [defendants'] unlawful consideration of race as a factor in hiring in the past [which] justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012) (citations omitted). Not only did Plaintiff fail to address this factor, TSA presented evidence that it "employed 538 African-Americans and 754 Caucasians (out of 1373 employees) . . . . " at the time of Plaintiff's termination. (Def.'s Mot. Ex. Z, EEO Report). Without any evidence of "background circumstances" suggesting that TSA discriminated against the majority, the Court is left only to conclude that Plaintiff has failed to carry her burden on this element.

Moreover, other than her inadmissible subjective opinion and beliefs, Plaintiff presents no evidence that similarly situated African-American co-workers received more favorable treatment than her. To be considered similarly situated, "the individuals whom [Plaintiff]

14

compares herself must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Humenny,* 390 F.3d at 906 (internal quotation marks and citations omitted). According to Plaintiff, she felt that Mr. Miller--a white male--"favored black people who could do him a service." (Rogers Dep. 202). This assertion, without more, leaves the Court only to guess whether these individuals were subject to the same standards and engaged in the same conduct as Plaintiff. As such, the Court finds that Plaintiff has failed to establish a *prima facie* case of race-based discrimination.

Finally, even assuming that Plaintiff did satisfy her burden under *McDonnell Douglas*, TSA has presented ample evidence of legitimate, non-discriminatory reasons for her transfer and subsequent termination.  (Igwe Dep. 41-44, 68-70; Thompson Dep. 15, 24-25; Cheryl Miller Dep. 65; McSpadden Dep. 76, 94; Def.'s Mot. Ex. II, Written Warning Notice; Def.'s Mot. Ex. Y, Counselors' Performance Evaluation; Def.'s Reply, Ex. C, Written Warning Notice.) Plaintiff, therefore, must come forward with evidence that TSA's proffered reasons were a pretext for discrimination. To satisfy her burden, Plaintiff must present sufficient evidence to permit a reasonable juror to conclude that TSA's proffered reasons (1) have no basis in fact, (2) did not actually motivate their decision to terminate, or (3) are insufficient to warrant her termination.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 654 (6th Cir. 2012).

The Sixth Circuit "has adopted the honest belief rule at the pretext stage of the evaluation of discrimination claims."  *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2013). "'[I]n order for an employer's proffered non-discriminatory basis for its

employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).  "The employer's decision-making process need not be optimal, or leave no stone unturned; '[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Smith*, 155 F.3d at 807).

Plaintiff argues, in essence, that TSA's proffered reasons were pretextual because (1) "the evidence shows that Plaintiff's files were audited and no violations were found", and (2) "there was no write-ups of Plaintiff in [her] personnel files over her 8 years of employment . . . . " (Plf.'s Resp. 10-11). The record belies both of these contentions. First, Plaintiff's files were reviewed on at least two separate occasions during her tenure at TSA. Both reviews--initiated by two different supervisors--revealed the same deficiency; namely, a failure to adequately maintain client records. (Thompson Dep. 24-25) ("I viewed her charts. I came to Carol and said, you're not doing this, you're not doing that. So, no, she wasn't properly doing her work."); (McSpadden Dep. 94) (following McSpadden's review of Plaintiff's files, he concluded that "her filing from her addiction counseling records was the same way as she was doing in my spiritual counseling department. She carried her lack of charting from addiction counseling into spiritual counseling."). Second, notwithstanding the numerous verbal warnings Plaintiff was issued, she was formally reprimanded by both Dr. Taylor and Mrs. Miller. (Def.'s Mot. Ex. II; Def.'s Reply Ex. C). "Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment." *Imwalle v. Reliance Medical Products, Inc.,* 515 F.3d 531, 546 (6th Cir. 2008).  In other words, Plaintiff

16

has failed to produce "sufficient evidence from which the jury could reasonably reject [TSA's] explanation and infer that [TSA] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (internal quotation marks and citations omitted).

Accordingly, the Court must and does grant TSA's motion with respect to Counts I and II.

### C. Age Discrimination

As discussed, Plaintiff's claim for age discrimination is likewise barred by the ministerial exception. Even assuming this was not the case, Plaintiff's claim fails for two reasons: First, Plaintiff openly admitted that she had no direct evidence of age discrimination:

> Q: So other than the fact that you were 64 and other than the fact that you believe that you were replaced or that someone else inside the organization was younger than you, do you have anything else to support the claim that you were discriminated against based on age?
>
> A. Circumstantial evidence because of who I was replaced by.
>
> Q. Do you have anything else?
>
> A. Not at this point, no.

(Rogers Dep. 207). Without any direct evidence of discrimination, Plaintiff's claim is subject to the *McDonnell Douglas* burden-shifting analysis described above. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009).  In light of the Court's conclusion that TSA has presented ample evidence of legitimate, non-discriminatory reasons for Plaintiff's termination, this claim fails for the same reasons previously identified. Accordingly, the Court grants TSA's motion with respect to Count IV.

17

### D.  Sexual Harassment/Quid Pro Quo

Finally, in Count III, Plaintiff maintains that TSA "created a hostile work environment which had the purpose or effect of altering Plaintiff's employment circumstances . . . . " (Compl. ¶ 32). TSA argues that Plaintiff's allegations, if true, are insufficiently "severe or pervasive" to establish a legally cognizable claim for hostile work environment sexual harassment. The Court agrees.

As a preliminary matter, the Court notes that Plaintiff has failed to respond to TSA's motion for summary judgment with respect to this claim and its state law counterpart. "It is well settled that abandonment may occur when a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment." *Anglers of Au Sable v. United States Forest Serv.,* 565 F.Supp.2d 812, 839 (E.D. Mich. 2008); *See also Hicks v. Concorde Career Coll.,* 449 F. App'x 484, 487 (6th Cir. 2011) ("[t]he district court properly declined to consider the merits of [Plaintiff's sexual harassment] claim because [he] failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.")

Notwithstanding Plaintiff's abandonment, her claim is legally devoid of merit. Hostile work environment claims address workplaces "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). In order to establish a prima facie case of a hostile work environment based on sex, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a

hostile work environment; and (5) the employer is vicariously liable. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir.2005).[5]

"In determining whether the alleged harassment is sufficiently severe or pervasive . . . the court must consider the totality of the circumstances." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). *See also id.* at 564 ("[A] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile work environment claim, even though no single episode crosses the Title VII threshold ."). "Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark*, 400 F.3d at 351 (quoting *Harris*, 510 U.S. at 23). [T]he test for a hostile work environment has both objective and subjective components." *Williams*, 187 F.3d at 566. In order to be actionable, the environment must be one "that a reasonable person would find hostile or abusive," and the employee must "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 21–22. "The plaintiff must show that the working environment was both objectively and subjectively hostile." *Clark,* 400 F.3d at 351.

According to Plaintiff's deposition, the following incidents support the claim that she was subjected to a hostile work environment:

---

[5] These requirements also apply to Plaintiff's ELCRA claim. *Radtke v. Everett,* 442 Mich. 368, 501 N.W.2d 155, 162 (Mich. 1993).

By Dr. Igwe: (1) told her "[s]it down [m]s. pretty. My weakness is pretty ladies" and "I just like looking at pretty ladies." (Rogers Dep. 153); (2) blew her kisses about 12 times (*Id.* at 153-156); (3) asked her jokingly if she wanted to come to an out of town conference with him (*Id.* at 153); (4) gave her a big hug (*Id.* at 154); and (5) talked about a "football touchdown." (*Id.* at 156).

By Mr. Miller: (1) jerked her head and slapped her in front of the counseling staff in 2010 (Rogers Dep. 164); (2) put his "hand under [her] hair and around [her] neck." (*Id.*); (3) grabbed her head/neck 20 times or less during staff meetings (*Id.* at 166); (4) told her she was a "good looking woman" around Easter 2013 (*Id.* at 172-73); and (5) put his hand around her waist 2 or 3 times in front of the other counselors in 2013 (*Id.* at 170-71).

By James McSpadden: remarked that she was "not bad for a white woman . . . . " (Rogers Dep. 161).

Accepting Plaintiff's version of the facts as true, this Court concludes that Plaintiff has not established that the alleged sexual harassment she experienced was objectively severe or pervasive enough to create a hostile work environment. First, with the exception of Mr. Miller's conduct at staff meetings--grabbing Plaintiff's head/neck--the incidents she describes "lack the continuous nature of conduct the Sixth Circuit has deemed sufficient to constitute a hostile work environment." *Mahan v. Peake*, No. 07–15223, 2009 WL 174130, at *6 (E.D.Mich. Jan. 23, 2009). Moreover, as TSA correctly points out, it is entirely unclear whether Mr. Miller's conduct at the meetings was "harassment based on sex." In fact, despite being asked on several occasions whether Plaintiff perceived Mr. Miller's conduct as sexual, she consistently answered that she "took it as personal." (Rogers Dep. 168-69). The Sixth Circuit has held that "[n]on-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis" only "where it can be shown that but for the employee's sex, [s]he would not have been the object of harassment." *Bowman*, 220 F.3d at 464 ("litany of perceived slights and abuses" subsequent to supervisor's

20

unwelcome sexual advances "[could] not be considered in hostile environment analysis because [plaintiff] ha[d] not shown that [it] was based upon his status as a male"); *see also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790-91 & n. 7 (6th Cir. 2000) (same). Plaintiff has failed to make such a showing here.

Second, Plaintiff's allegations lack the necessary severity. Indeed, while Plaintiff focused on a number of individual incidents during her deposition, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether–when taken together–the reported incidents make out such a case." *Bowman* 220 F.3d 456 at 463. Furthermore, the Sixth Circuit has expressly rejected a number of hostile environment claims arising from conduct that was far more severe than the universe of incidents alleged here. *Compare Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (a hostile work environment was not shown where the plaintiff claimed that "Brock told vulgar jokes, that he twice placed his vibrating pager on her thigh as he passed her in the hall, and most significantly, he pulled at her overalls after she told him she was wearing a thong."); *and Stacy v. Shoney's, Inc.*, No. 97-5393, 142 F.3d 436, at *1-3 (6th Cir. 1998) (the plaintiff failed to establish a prima facie claim where, over a two month period, a male supervisor continuously made sexually suggestive comments about the female plaintiff's appearance, touched her breast as he removed and replaced a pen from her shirt pocket, leered at her, and told her that if he had someone like her, he would never let her leave the house.); *with EEOC v. Harbert-Yeargin, Inc.,* 266 F.3d 498, 508-09 (6th Cir. 2001) ("we found that the plaintiff made a prima facie showing of a hostile workplace where a male supervisor grabbed a male employee's

genitals on two separate occasions, stalked the employee several times a day, and where the employee's co-workers taunted him for making a harassment complaint.")

In addition, Plaintiff has failed to argue--let alone present evidence--that any of the alleged objectionable conduct caused her to miss work or otherwise interfered with her work performance. On the contrary, Plaintiff rated both her "working conditions" and "co-workers" as "excellent" in her exit interview. (Def.'s Mot. Ex. FF). This likewise calls into question the subjective component of her claim. For these reasons, Plaintiff has failed to present sufficient evidence such that a reasonable juror could find an actionable hostile work environment. Accordingly, Plaintiff cannot establish the fourth element of her prima facie case for sexual harassment.

Finally, the Court need only give passing treatment to Plaintiff's quid pro quo claim. To prevail on a quid pro quo claim of sexual harassment, a plaintiff must assert and prove, *inter alia,* "that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employer's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment . . . . " *Highlander v. K.F.C. Nat'l Mgt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986). Plaintiff's own testimony is self-defeating on this score:

> Q. Did anything . . . ever come up like you had to do something sexual to keep your job?
>
> A. No. No, I don't believe so.
>
> Q. Or it can be, I suppose, [hypothetically] you are going to have to deal with me touching you . . . to keep your favorite car parking spot just outside the door . . . . Did they ever do that to you?

> A. [Mr. Miller] called me in about my parking spot and I didn't know what he was talking about . . . .  I said I don't know, it's different every day, so he just started being disgusting again but he didn't refer to anything sexual.

(Rogers Dep. 160, 208-09). In other words, the record is clear that Plaintiff was never faced with an ultimatum regarding her job or any benefits associated with it, and the sexual harassment she was allegedly experiencing. Nor is there any evidence that Mr. Miller or Dr. Igwe made and carried out any threats to Plaintiff that they would retaliate against her if she denied a sexual advance. Accordingly, Plaintiff's quid pro quo claim is dismissed.

## IV.  Conclusion

For the above-stated reasons, TSA's motion for summary judgment is GRANTED.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 11, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 11, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager

23